## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRENT S., ANGIE S., J.B., R.B., A.F., C.S. and )
H.S., individually and on behalf of all others )
similarly situated, )
            )      CIVIL ACTION
            )
Plaintiffs, )      NO. 1:17-cv-11569-ADB
            )
            )
BLUE CROSS AND BLUE SHIELD )
OF MASSACHUSETTS, INC., and BLUE CROSS )
AND BLUE SHIELD OF MASSACHUSETTS )
HMO BLUE, INC., )
            )
Defendants. )
_____ )

## THIRD AMENDED CLASS ACTION COMPLAINT
_____

### INTRODUCTION

  Brent S. ("Brent"), and Angie S. ("Angie") (parents of "Jake"), J.B. and R.B. (parents of

"D.B."), A.F. (father of "J.F."), and C.S. and H.S. (parents of "E.S.") (collectively "Plaintiffs"),

individually and as representatives of the Class[1] of similarly situated individuals, complain and

allege against Defendants Blue Cross and Blue Shield of Massachusetts, Inc. ("Blue Cross, Inc.")

and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("HMO Blue") (collectively

"BCBSMA" or "Defendants") violated the Employee Retirement Income Security Act of 1974

("ERISA") and the Secretary of Labor ERISA claim regulations.[2]

  BCBSMA engaged in a systematic practice of deceiving families when denying their

children coverage for mental health out-of-network residential treatment ("OON RT") under health

_____

[1] The capitalized term "Class" used throughout is defined below under the "**CLASS ALLEGATIONS**" header.
[2] The allegations made in this Third Amended Class Action Complaint are based upon the evidence obtained during discovery and the experience of the Plaintiffs.

care benefit plans, either insured or administered by BCBSMA, by misleadingly citing to a so-called "educational setting" exclusion in coverage denial letters rather than the true specific bases for the denial. [3]

When rendering an adverse-benefit determination, the Secretary's ERISA regulations impose on BCBSMA a duty to disclose: "(i)The specific reason or reasons for the adverse determination"; "(ii) Reference to the specific plan provisions on which the determination is based"; and "(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See* 29 C.F.R. § 2560.503–1(g)(1). Because BCBSMA failed to provide each Plaintiff and the Class with the specific information and bases for denying the residential treatment they required to address their often times life-threatening mental illness, BCBSMA  violated their right to a "full and fair review" under ERISA. 29 U.S.C. § 1133(1).

## PARTIES

1.      Plaintiffs Brent and Angie are individuals residing in Douglas County, Colorado. Brent and Angie are citizens of Colorado.  Brent, Angie, and their son Jake are participants under a Blue Cross, Inc. ERISA administered and governed self-funded health plan provided by Brent's private sector employer.

2.      Plaintiffs J.B. and R.B. are individuals residing in, and citizens of, New Hampshire. J.B., R.B. and D.B. participants under a Blue Cross, Inc. ERISA governed health insurance policy provided by R.B.'s private sector employer. The applicable BCBSMA case number is 99155AKE00.

---

[3] Other terms BCBSMA used when denying coverage based on the "educational setting" exclusion were "educational program(s)," an "educational facility and program," a "boarding school," a "therapeutic boarding school," a "residential therapeutic school," or a  "school setting[.]"

3.     Plaintiff A.F. is an individual residing in, and a citizen of, Colorado.  A.F. and his daughter J.F. are participants under a Blue Cross, Inc. ERISA governed health insurance policy provided by A.F.'s private sector employer. The applicable BCBSMA case number is 99207E5Z00.

4.     Plaintiffs C.S. and H.S. are individuals residing in, and citizens of, Massachusetts. C.S., H.S. and their son E.S. are participants under an HMO Blue ERISA governed health insurance policy provided by C.S.'s private sector employer. The applicable BCBSMA case number is 99134EHB00.

5.     Defendant Blue Cross, Inc. is a Massachusetts corporation organized and existing under General Laws chapter 180 having a usual place of business at 101 Huntington Avenue, Boston, Suffolk County, Massachusetts. Blue Cross, Inc. is a citizen of Massachusetts.

6.     Defendant HMO Blue is a Massachusetts corporation organized and existing under General Laws chapter 180 having a usual place of business at 101 Huntington Avenue, Boston, Suffolk County, Massachusetts. HMO Blue is a citizen of Massachusetts.

**THE INTERLOCKING RELATIONSHIP AMONG DEFENDANTS**

7.     Defendant HMO Blue, is a wholly owned subsidiary of Defendant Blue Cross, Inc. Defendant HMO Blue is also "wholly-controlled" by Blue Cross, Inc. as admitted by Defendants in their Internal Revenue Service filings:

> BLUE CROSS BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC. ("HMO BLUE") IS A WHOLLY-CONTROLLED SUBSIDIARY ORGANIZATION OF BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. ("BCBSMA"). THE BOARD OF DIRECTORS OF HMO BLUE IS LARGELY MADE UP OF OFFICERS OF BCBSMA. HMO BLUE BOARD MEMBERS ARE APPROVED, APPOINTED AND OPERATE UNDER THE DIRECTION BY/OF THE BOARD OF DIRECTORS OF BCBSMA, AN INDEPENDENT GOVERNING BODY.[4]

---

[4]      *See*       HMO        Blue's       IRS        Form       990        for        2017: https://990s.foundationcenter.org/990_pdf_archive/043/043362283/043362283_201712_990O.pdf at p. 35.

8.      As the HMO Blue IRS Form 990 discloses, Defendants share the same officers (CEO, CFO, COO, Treasurer, Chief Legal Officer, Vice President, Assistant Treasurer) as well as even the same physician file reviewers.[5]  In addition most of the officers of HMO Blue, who are also officers of Blue Cross, Inc., receive compensation entirely from Blue Cross, Inc. with no reportable compensation disclosed by HMO Blue.[6]

9.      As disclosed by Blue Cross, Inc., in its consolidated financial statements, "HMO Blue and [Blue Cross, Inc.] operate under common Board of Directors management and control."[7] HMO Blue has no employees who are not also employed by Blue Cross, Inc., "Employees of the Companies [i.e. collectively Blue Cross, Inc. and HMO Blue] (the "Associates") are either: concurrently employed by the Companies or solely employed by [Blue Cross, Inc.][.]"[8]

10.     Because the actions and omissions of Blue Cross, Inc. are also the actions of HMO Blue, and *vice versa*, Defendants are collectively called BCBSMA, or Defendants, throughout this Third Amended Class Action Complaint.

## JURISDICTION AND VENUE

11.     The BCBSMA health insurance policies, and the self-funded plans it administers, are governed by ERISA, 29 U.S.C. § 1001, *et. seq*.

12.     BCBSMA acted as a fiduciary, as that term is defined at 29 U.S.C. § 1002(21), under the ERISA plans subject to this lawsuit.

13.     This Court has jurisdiction over this matter under 29 U.S.C. §1132(e)(1) and 28 U.S.C.§

---

[5] *Id*. at 9-10.
[6] *Id*.
[7] Blue Cross and Blue Shield of Massachusetts, Inc. Years Ended December 31, 2018 and 2017 Audited Financial Statements, https://aboutus.bluecrossma.com/sites/g/files/csphws1376/files/PDFs/BCBSMA%20Inc.%20AFS%204.25.19%20-%20with%20Supplementary%20Information.pdf at 56.
[8] *Id* at 57.

1331.

14.     Venue is proper under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) and (c), because BCBSMA is a citizen of Massachusetts, and administers ERISA welfare benefit plans in Massachusetts.

### FACTS COMMON TO ALL CAUSES OF ACTION

15.     BCBSMA is one of the largest health insurers, and self-funded plan administrators, in the country.

16.     Under ERISA, BCBSMA must administer welfare benefit plans solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits and in accordance with the instruments that govern its health insurance policies and self-funded plans.

17.     BCBSMA has failed to meet its fiduciary duty to administer its plans, both insured and self-insured, in the best interests of the employees covered under those plans, and in particular, the employees' children suffering from mental illness.

18.     BCBSMA acknowledges that throughout the United States there is a mental health crisis impacting adolescents.[9]

19.     On July 23, 2020 BCBSMA issued a press release in which Andrew Dreyfus, CEO of BCBSMA stated, "We know that far too many of our members – both children and adults -- are not getting the mental health care they deserve." Mr. Dreyfus continued, "Taken together, we believe these initiatives will help address a critical need at a time when access to high quality mental health services has never been more important." [10]

20.     Because so few BCBSMA in-network providers offer adolescent residential mental

---

[9] The term "adolescent" used throughout this Third Amended Class Action Complaint means any insured under the age of 19 years at the time of their treatment in question.
[10]      https://newsroom.bluecrossma.com/2020-07-23-Blue-Cross-Blue-Shield-of-Massachusetts-Announces-Bold-New-Action-To-Expand-Members-Access-to-Mental-Health-Services

health treatment, a transparent and fair process for adjudicating coverage of OON RT by BCBSMA is critical. That is why the issues raised in this litigation are so important.

**Relevant Policy Terms**

21.     Coverage of residential mental health treatment, referred to as "acute residential treatment" by BCBSMA, is afforded under the Class Policies' "Intermediate Treatments" provision:

> **Intermediate Treatments**
> There may be times when you will need *medically necessary* care that is more intensive than typical *outpatient* care. But, you do not need 24-hour *inpatient* hospital care. This "intermediate" care may include (but is not limited to):
> - Acute residential treatment. Your coverage for this treatment is considered to be an *inpatient* benefit. During the *inpatient* pre-service review process (see Part 4), *Blue Cross and Blue Shield* will assess your specific health care needs. The least intensive type of setting that is required for your *mental condition* will be approved by *Blue Cross and Blue Shield*.
> - Partial hospital programs or intensive outpatient programs. Your coverage for these programs is considered to be an *outpatient* benefit.
>
> If you would normally pay a *copayment* for *inpatient* or *outpatient* benefits, the *copayment* will be waived when you get covered intermediate care. But, you must still pay your *deductible* and/or *coinsurance*, whichever applies.

22.     While the Intermediate Treatments provision changed only slightly during the Class Period[11], none of the Class Policies[12] include a definition for the term "Acute residential treatment[.]"

23.     In July 2019, when the Class Period ends, BCBSMA finally defined this crucial policy term with an update to its standard policy form language, "Acute residential treatment…These services may sometimes be referred to as sub-acute care services. These services offer 24 hours a day, 7 days a week access to medical services and on-site or on-call nursing staff."

24.     Similarly, the "**No benefits** are provided for" list which BCBSMA quotes in its Class Period denial letters when citing the "educational setting" exclusion, changed only slightly during

---

[11] "Class Period" refers to the time period between January 1, 2015 and July 25, 2019.
[12] "Class Policies" refers to health insurance policies or self-funded plans that contain this same or similar language, "No benefits are provided for exams, evaluations, or services that are performed solely for educational or developmental purposes. The only exceptions are for: …treatment of mental conditions for enrolled dependents who are under age 19."

the Class Period:

> **No benefits** are provided for: psychiatric services for a condition that is not a *mental condition*; residential or other care that is *custodial care*; and services and/or programs that are not *medically necessary* to treat your *mental condition*. Some examples of services and programs that are not covered by this health plan are: services that are performed in educational, vocational, or recreational settings; and "outward bound-type," "wilderness," "camp," or "ranch" programs. These types of non-covered programs may be in residential or nonresidential settings. They may include therapeutic elements and/or clinical staff services as well as vocational, educational, problem solving, and/or recreational activities. These programs may have educational accreditation. The staff may include some licensed mental health providers who may provide some therapy. No benefits are provided for any services furnished along with one of these non-covered programs. For example, no benefits are provided for therapy and/or psychotherapy furnished along with one of these non-covered programs.

25.     The "Educational Testing and Evaluations" provision did not change at all during the Class Period:

## Educational Testing and Evaluations

No benefits are provided for exams, evaluations, or services that are performed solely for educational or developmental purposes. The only exceptions are for: covered early intervention services; treatment of *mental conditions* for enrolled dependents who are under age 19; and *covered services* to diagnose and/or treat speech, hearing, and language disorders. (See Part 5.)

26.     The slight differences in the Class Policies' language is not consequential to the common ERISA violations related to BCBSMA's common practice of issuing misleading denial letters when rejecting coverage of adolescent residential treatment based on the "educational setting" exclusion during the Class Period.

27.     With no definition for "acute residential treatment" and a laundry list of non-specific undefined exclusions, like the "educational settings" exclusion, coupled with the exception to the exclusion for educational services when the insured is under age 19 quoted above, the Class Policies are vague and ambiguous as they relate to coverage of residential treatment for adolescents. In what appears to be an admission that the language surrounding coverage of adolescents' residential treatment is vague and ambiguous, ██████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ since the Class Policies themselves provide no specifics.

28. ███████████████████████████████████████████████████████

████████████████████████████████████████

29.     In reality, the "educational setting" exclusion is merely a label BCBSMA attached to the

Plaintiffs' and Class members' OON RT denials ████████████████████████████████

███████████████████████████████████████████████.

30.     The so-called "educational setting" exclusion is not applied like a real policy exclusion

where service X is covered, but then service X falls out of coverage because of an exclusion to

that coverage. Again, this practice of not treating the "educational setting" exclusion like an actual

policy exclusion, rather using it as a misleading denial label, can only be interpreted as an

admission by BCBSMA that the so-called "educational setting" exclusion is vague and thus

unenforceable.

31.     Ultimately however, ambiguities aside, the real issue at the heart of this litigation is

BCBSMA's issuance of misleading adverse benefit determination letters that cite to the

"educational setting" exclusion and not the true criteria and information utilized by BCBSMA.

**BCBSMA Engaged in a Systematic Practice of Issuing Misleading Coverage
Determinations When Denying Adolescent Residential Treatment Claims based on the
"Educational Setting" Exclusion in Violation of ERISA**

32.     BCBSMA denied coverage and issued materially false adverse-benefit determination

letters to participants who needed OON RT, stating the programs were denied based on the

"educational setting" exclusion when in reality BCBSMA had different reasons for the denial.

33.     BCBSMA's adverse-benefit determination letters issued to the Plaintiffs and the Class

which cited the "educational setting" exclusion were misleading for two primary reasons:

    a.  the actual denial basis was that BCBSMA determined the facility did not meet ██

        ████████████████████████████████████████████████████████

        ████████████████████████████████; and

b. BCBSMA *requires* a covered residential treatment program serving adolescents to provide schooling so that adolescents do not fall behind in their studies while undergoing treatment, which can last for months or more.

34. Appealing the adverse-benefit determinations, as is typically required under the ERISA plans and ERISA common law before the start of litigation, was futile here because BCBSMA elected not to disclose the true reason for why it denied the coverage requested by Plaintiffs and the Class, instead citing to the vague and ambiguous "educational setting" exclusion.

35. If BCBSMA had been forthright with the Plaintiffs and Class, ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ in arriving at the coverage decision.

36. Moreover, the BDEN/InterQual Criteria utilized by BCBSMA are neither an accurate interpretation of coverage under the Class Policies or in line with generally accepted medical standards.

37. BCBSMA misled participants, encouraging them to gather medical records and to collect statements and medical determinations to support their appeals, knowing that BCBSMA's Members Appeals and Grievances department had no intention of reviewing these documents because the "educational setting" adverse-benefit determination was not based on medical necessity.

38. ████████████████████████████████████████████████████████ ████████████████████████████████. Appealing these decisions was thus completely futile.

39. This futility is not surprising, because the Class Members were unable to set forth "evidence necessary to dispute the denial of [their] claim for benefits" because BCBSMA did not

disclose the true reason it denied coverage which "impaired [their] ability to 'prepare an informed response to [BCBSMA's] decision'." *DiGregorio v. Hartford Comprehensive Employee Ben. Serv. Co.*, 423 F.3d 6, 17 (1st Cir. 2005).

40. Without knowing the real reason for the denial of their claim, offering meaningful evidence on appeal in what should be a non-adversarial process was impossible. This bears out ███████ ████████████████████████████████████████████████████████████████████████████.

41. When rendering an adverse-benefit determination, the Secretary of Labor ERISA regulations impose on BCBSMA a requirement to disclose: "(i)The specific reason or reasons for the adverse determination"; "(ii) Reference to the specific plan provisions on which the determination is based"; and "(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See* 29 C.F.R. § 2560.503–1(g)(1).

42. Under the Secretary of Labor ERISA claims regulations, BCBSMA had an obligation to disclose the true reason for denying the claims, including: (1) the specific information BCBSMA gathered about the OON RT program, and the process for how that information was gathered; and (2) ████████████████████████████████████████████████████████████████████ ████████████████████████.

43. BCBSMA's election not to disclose the true reason(s) for denying the Class members' claims violated the central tenet of ERISA's implementing regulations.

44. Under ERISA every benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133.

45. BCBSMA must disclose all internal rules, guidelines, protocols, memorandum, and training materials relating to the benefit denial at issue. *See* 29 CFR 2560.503-1(g)(1) (v).

46. Section 29 C.F.R. 2560.503-1(h)(2)(iii) requires as part of a full and fair review of a benefit denial, disclosure of all documents "relevant" to a beneficiary's claim for benefits.

47. A document is "relevant" as defined in section (m)(8)(ii) if it, "[w]as submitted, considered or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

48. Section 29 C.F.R § 2560.503-1(m)(8)(iv) provides, "In the case of a group health plan or plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination."

49. 
that BCBSMA had an obligation to disclose under the Secretary of Labor ERISA claims regulations.

50. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ that must be disclosed.

51. Section 29 U.S.C. § 1024(b)(4), mandates disclosure of "other instruments under which the plan is established or operated" to plan participants upon request.

52. The U.S. Department of Labor Advisory Opinion Letter 96-14a interprets 29 U.S.C. § 1024(b)(4) as follows:

The legislative history of ERISA suggests that plan participants and beneficiaries should have access to documents that directly affect their benefit entitlements under an employee benefit plan. Consistent with this Congressional intent, it is the view of the Department of Labor that, for purposes of section 104(b)(2) and104(b)(4), any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement under an employee benefit plan would constitute an instrument under which the plan is established or operated, regardless of whether such information is contained in a document designated as the "plan document." Accordingly, studies, schedules or similar documents that contain information and data, such as information and data relating to standard charges for specific medical or surgical procedures, that, in turn, serve as the basis for determining or calculating a participant's or beneficiary's benefit entitlements under an employee benefit plan would constitute "instruments under which the plan is . . . operated."

53. ████████████████████████████████████████████████████████████████████

████████████████████████████████████████ that BCBSMA was required to disclose to

participants but did not.

54.   The purpose of ERISA's full and fair review requirement is to provide claimants with

sufficient information to prepare adequately for the internal appeal, or an appeal to a court.

55.   ████████████████████████████ and the related information gathered by BCBSMA

about their OON RT programs, the Class was denied information sufficient to understand the bases

for their denials and to prepare for their appeals, or to appeal to the courts under ERISA.

56.   Full and fair review under ERISA includes "knowing what evidence the decision-maker

relied upon, having an opportunity to address the accuracy and reliability of that evidence, and

having the decision-maker consider the evidence presented by both parties prior to reaching and

rendering his decision." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (quoting

*Grossmuller v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 715 F.2d 853,

858 n.5 (3d Cir. 1983)).

57.   By withholding the ████████████████████████████████████████████████

████████████████████████████████████████████████, BCBSMA violated its

duty to act in the best interests of plan participants.

58.     To add credibility to adverse-benefit determination letters, for the majority of the so-far identified Class members, BCBSMA attached the signature of a nationally recognized and prominent BCBSMA child psychiatrist who was not involved in the coverage determinations.

59.     The physician's signature falsely implied that this child-psychiatrist, with a national reputation for mental health advocacy, had reviewed the family's request for care and the specifics of the program requested, and that this psychiatrist concluded that the requested coverage was unavailable under the policy.

60.     The child-psychiatrist had not reviewed any of the Plaintiffs' or Class members' claims.

61.     Often, no physician at all reviewed the request for coverage.

62.     BCBSMA attached the psychiatrist's signature to adverse-benefit determination letters only after this psychiatrist left his role that focused on coverage decisions and took a prominent public position as a spokesperson for BCBSMA on mental health care.

63.     The child psychiatrist never authorized BCBSMA to sign his name.

64.     The child psychiatrist, to his credit, spent several years demanding that BCBSMA stop the deceptive practice of using his name and signature on the denial letters.

65.     A statutory fiduciary violates its fiduciary obligation by misleading a plan participant.

66.      the "educational setting" exclusion was not the real reason for the adverse-benefit determination.

67.     BCBSMA withheld this information from the Plaintiffs and Class during the ERISA internal appeals process in violation of ERISA's implementing regulations.

**The Plaintiffs' Claims**

68.     Jake received treatment for his mental health disorders at Ashcreek Ranch Academy ("ARA"), a licensed residential treatment program in Washington County, Utah from March 13, 2014 through January 24, 2015. During this 10-month time period, Jake was 17 years old.

69.     Jake struggled with mental health problems involving suicidal thoughts, self-esteem, and substance abuse for several years before being admitted to ARA.

70.     Jake began smoking marijuana when he was thirteen. In the months before his admission to ARA, Jake had progressed to using various pills, cocaine, and heroin. He was depressed and ashamed about his behavior and the problems he was causing friends and family. He was prescribed with an anti-depressant and, later, a mood stabilizer.

71.     Before his admission to ARA, Jake had been involved in a number of physical assaults with others, including with Brent. He had also been brought into the juvenile justice system based on substance abuse and his assaults.

72.     Jake ran away from home during this time frame. After three days he contacted his mother and told her he was OK and came home a day later.

73.     Several months before being admitted to ARA Jake had been ordered by a juvenile court judge to receive mental health treatment for his substance abuse. He did well in rehabilitation for four months but then, immediately before his admission to ARA, relapsed and began using drugs again. Given the continuing deterioration, Brent and Angie, in consultation with and recommendations from Jake's health providers, arranged for treatment at ARA.

74.     Immediately before Jake's admission to ARA, he had been treated on an acute inpatient basis at Mountain Crest Behavioral Health Center ("MCBHC") in Fort Collins.

75.     At the time of his discharge from MCBHC, Brent and Angie had no ability to keep Jake

from running away and either committing suicide or self-harming unless he was transferred directly to a sub-acute inpatient residential treatment setting. Health care professionals involved with Jake's treatment at MCBHC recommended residential treatment for Jake to treat his mental health disorders. Brent drove Jake directly to ARA from MCBHC in March, 2014.

76.    Jake was 17 years old at the time of his admission to ARA.

77.    ARA was licensed with the Utah State Department of Human Services to provide residential treatment for adolescents during the entire time Jake was treated at ARA. Copies of ARA's licenses during the time Jake was treated were provided to BCBSMA by both Brent and Angie and ARA during the pre-litigation appeal process for this case. ARA's licensure and the services it provided to its patients fall within the coverage provisions of Jake's health insurance policy, specifically, the adolescent exception to the alleged educational component exclusion.

78.    Authorization was requested from BCBSMA for coverage of Jake's treatment at ARA. In addition, claims were submitted to BCBSMA for coverage of Jake's treatment at ARA.

79.    On February 25, 2015, BCBSMA denied Jake's claim for coverage of his treatment at ARA, citing to a so-called "ranch" exclusion.

80.    Brent appealed the denial of coverage on April 15, 2015.

81.    BCBSMA again denied Jake's claim on May 14, 2015. In this denial, BCBSMA asserted that the sole basis for the claim denial was because "Ashcreek Ranch Academy is a residential treatment [sic] and boarding school. Ashcreek Ranch Academy is not a covered type of provider on your . . . Plan." BCBSMA then quoted the vague and ambiguous policy language referencing the alleged coverage limitation for mental health services performed with an educational component and concluded "[w]e are not questioning the medical necessity of the service or making a medical judgment."

82.     Similar to Jake, 17-year-old D.B. struggled with mental health disorders such as depression, attention deficit-hyperactivity disorder, and oppositional defiant disorder.

83.     On advice of her treatment providers, D.B. moved inpatient to Ironwood Maine ("Ironwood"), a State of Maine licensed "Children's Residential Care Facility." D.B. resided at Ironwood from August 1, 2017 to August 6, 2018.

84.     BCBSMA denied D.B.'s initial claim for Ironwood on August 3, 2017, noting "[b]ased on the information publically available to us about this facility and program, including the web address HTTP://WWW.IRONWOODMAINE.COM/STAFF.HTML, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

85.     BCBSMA maintained its denial on appeal, explaining in a January 25, 2018 letter that, "although D.B. may have resided in or at a residential therapeutic school, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying this claim since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that D.B. qualified for at the time that she entered Ironwood Maine LLC."

86.     D.B.'s stay at Ironwood should have been covered by her BCBSMA policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

87.     Just like Jake and D.B., 13-year-old J.F. suffered from mental health disorders including a major depressive disorder and an anxiety disorder.

88.     On advice of her mental healthcare treatment providers, J.F. moved inpatient to Moonridge Academy ("Moonridge"), a State of Utah licensed "RESIDENTIAL TREATMENT" facility

"FOR 16 YOUTH FEMALE CLIENTS AGES 12 TO 17[.]" J.F. resided at Moonridge from January 15, 2018 to November 29, 2018.

89.     BCBSMA denied J.F.'s initial claim for Moonridge on January 16, 2018, noting in verbatim fashion to D.B.'s initial denial, "[b]ased on the information publically available to us about this facility and program, including the web address http://www.moonridgeacademy.com/ADVENTURE-THERAPY, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

90.     J.F. appealed and on July 20, 2018 BCBSMA rendered a final adverse-benefit determination stating the identical language found in D.B.'s adverse-benefit determination letter stating, "although J.F., may have resided in or at an educational program, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying these claims since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that J.F., qualified for at the time that she entered Moonridge Academy."

91.     J.F.'s stay at Moonridge should have been covered by her BCBSMA policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

92.     Just like Jake, D.B., and J.F., 14-year-old E.S. suffered from mental health disorders including attention-deficit/hyperactivity disorder.

93.     On advice of his treatment providers, E.S. moved inpatient to Maple Lake Academy for Boys ("Maple Lake"), a State of Utah licensed "RESIDENTIAL TREATMENT" facility "FOR 16 YOUTH MALE CLIENTS AGES 12 TO 17[.]" E.S. resided at Maple Lake from June 1, 2017

to January 22, 2019.

94.     BCBSMA denied E.S.'s initial claim for residential mental health care treatment at Maple Lake on June 6, 2017, noting in verbatim fashion to D.B. and J.F.'s initial denial, "[b]ased on the information publically available to us about this facility and program, including the web address http://www.maplelakeacademy.com/, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

95.     E.S. appealed and on September 26, 2017 BCBSMA rendered an adverse-benefit determination using near verbatim language as J.F. and D.B.'s appeal denials quoted above, "although you, may have resided in or at an educational setting, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying this claim since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that you qualified for at the time that you entered Maple Lake Academy for Boys."

96.     E.S. appealed again, and on December 19, 2017, BCBSMA issued its final adverse benefit determination stating "[w]e believe that our denial rationale is valid and that services received in an educational setting are in fact excluded from coverage under your plan[.]"

97.     E.S.'s stay at Maple Lake should have been covered by his HMO Blue policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

98.     None of the Plaintiffs were told about the ███████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████. All four Plaintiffs were issued misleading denial letters that cite to the "educational setting" exclusion and not the true bases for the coverage decline. Plaintiffs

have exhausted their ERISA pre-litigation appeal obligations under the ERISA plan instruments before filing this action, and even if they had not, the appeals were futile. Plaintiffs have paid substantial sums of money for OON RT for Jake, D.B., J.F. and E.S.'s and BCBSMA has paid nothing.

## CLASS ALLEGATIONS

99.     The common thread among all four lead Plaintiff families and the Class members is that they received an adverse-benefit determination for an OON RT provider from BCBSMA, and the stated basis for that denial was because the program was an excluded "educational setting."

100.    For those Class members who received the "educational setting" denial basis in their initial denial letters, (including D.B., J.F. and E.S.), BCBSMA followed a template denial letter that changed slightly during the Class Period. For those Class members who received their "educational setting" denial basis for the first time in response to an appeal (including Jake), the appeal denial letters ███████████████████████████████████████████████████████████████

███.[13]

101.    No adverse benefit determination letter sent to a Class member disclosed that (a) ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████, thus making it impossible for the Plaintiffs and the Class to challenge the accuracy of the information BCBSMA relied upon in rendering its adverse benefit decision.

---

[13] To be sure, by raising a new substantive ground (i.e. the "educational setting") in the appeal denial, BCBSMA should have offered another appeal to comply with the Secretary's regulations. Thus, the remedy for both types of denial letter Class members is the same – a remand and order to comply with ERISA. *See Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004) (ERISA regulations are "undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.").

102.     BCBSMA's systematic actions in violation of ERISA and the terms of the health insurance policies and self-funded plans, as outlined above, are breaches of its fiduciary duties to the participants and their beneficiaries under 29 U.S.C. §§ 1104(a)(1)(A) and (a)(1)(D).

103.     Including Jake, D.B., J.F., and E.S., there are at least 45 Class member insured adolescents under BCBSMA ERISA health insurance policies and self-funded plans it administers that had OON RT claims improperly denied based on BCBSMA's misleading citation to the vague "educational setting" exclusion.

104.     Plaintiffs seek certification of the following class under F.R.C.P 23(b)(1) and (b)(2):

> "Class": All former or current BCBSMA ERISA governed health insurance beneficiaries who are, or were, covered by a health insurance policy or self-funded plan that contains this same or similar language, "No benefits are provided for exams, evaluations, or services that are performed solely for educational or developmental purposes. The only exceptions are for: …treatment of mental conditions for enrolled dependents who are under age 19[,]" ("Class Policy" or Class Policies") and who were issued a denial letter between January 1, 2015 and July  25, 2019 ("Class Period") stating that a mental health residential treatment program they attended while under the age of 19 was not covered by their Class Policy, at least in part, because the program was an "educational program(s)," an "educational facility and program," a "boarding school," a "therapeutic boarding school," an "educational setting," a "residential therapeutic school," or a  "school setting[.]" [14]

105.     The requirements for certification of a class under F.R.C.P 23(b)(1) and (b)(2) have been met.

106.     Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. Here, BCBSMA has produced 45 sample denial letters for the Class, including the four named Plaintiffs, whose requests for OON RT were allegedly denied based on the "educational setting" exclusion as stated in their denial letters.

---

[14] Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or is a parent or subsidiary of, or is controlled by, the Defendants, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

107.   45, at minimum, is a sufficiently numerous class.

108.   Rule 23(a)(2) requires that there be questions of law or fact that are common to the Class.

109.   Both claims asserted below raise at least one common issue arising out of BCBSMA issuing misleading denial letters to all Class members: does BCBSMA's citation to the "educational setting" exclusion, ███████████████████████████████ ████████████████████████, violate ERISA's disclosure and full and fair review requirements?

110.   This issue satisfies the test for commonality because its determination will resolve an issue central to BCBSMA's liability in one stroke.

111.   Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

112.   Like Plaintiffs, the Class members have all suffered "the same or similar injury": they were all issued a misleading denial letter that cites the same "educational setting" exclusion, but not the actual specific bases considered and relied upon by BCBSMA when denying coverage, thus eliminating (1) full and fair review and (2) any meaningful ability to appeal the denial.

113.   This common injury springs from the same "uniform course of conduct," namely: BCBSMA delivered to the Class members materially misleading template denial letters.

114.   Rule 23(a) requires that Plaintiffs demonstrate that they will fairly and adequately protect the interests of the Class.

115.   Plaintiffs' interests are co-extensive and do not conflict with the proposed Class members' interests and are typical of the claims of the other Class members.

116.   Plaintiffs have an interest in vigorously prosecuting this case on behalf of the proposed Class because they seek to have their claims remanded to BCBSMA so that their claims may be

reprocessed in accordance with ERISA's full and fair review mandate. This explicitly advances the interests of the Class in lockstep.

117.    Likewise, Class counsel selected by Plaintiffs will continue to vigorously prosecute this action on behalf of the Class. Class counsel has significant experience in ERISA governed health insurance litigation and insurance focused consumer class litigation.

118.    A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions … would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Fed.R.Civ.P. 23(b)(1)(A).

119.    That is precisely the situation here. If the 45 already identified Class members/Plaintiffs were to file separate lawsuits all over the country seeking injunctive relief, some courts may tell BCBSMA it violated ERISA and order an injunction, whereas other courts could potentially find BCBSMA's conduct permissible. Pursuit of similar claims for systemic reform through multiple individual suits would not only be inefficient, it would create a risk that different courts might order divergent or even conflicting relief.

120.    Certification is also proper pursuant to Rule 23(b)(1)(B), which requires a showing that "adjudications with respect to individual class members … would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). ERISA requires that, where appropriate, plan provisions must be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).

121.    If this Court were to find BCBSMA's policies require BCBSMA to act in a certain fashion, ERISA would require BCBSMA to act in a similar fashion toward all beneficiaries—the

quintessential (b)(1)(B) scenario.

122.     A class is proper under Rule 23(b)(2) if the party opposing the class has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole…" Fed.R.Civ.P. 23(b)(2).

123.     Plaintiffs and the Class members are all seeking declaratory and injunctive relief to remedy the same conduct on the part of BCBSMA: an order that BCBSMA's practice of issuing misleading adverse benefit determination letters citing the "educational setting" exclusion, rather than the specifics of the criteria and information BCBSMA actually assessed, violated ERISA and a class wide remand should be ordered.

124.     Finally, a proposed class is ascertainable if it is well defined and membership turns on objective criteria.

125.     Plaintiffs have identified the specific "objective criteria" here as the language BCBSMA used when referring to the "educational setting" exclusion and incorporated them into the Class definition. Given that BCBSMA stores initial OON RT provider denial letters on its databases in text searchable word format, BCBSMA needs to run searches for that language in the applicable sub-folders to identify all of the Class members, and a similar process can be run in their appeal denial records (for those Class members who had the "educational setting" raised for the first time in an appeal denial).

126.     In addition, a manual review searching for these terms can be performed against all adolescents' OON RT coverage requests denied during the Class Period under a Class Policy.

## FIRST CAUSE OF ACTION
### (Claim for Benefits under 29 U.S.C. §1132(a)(1)(B))

127.     Plaintiffs restate and reallege all prior paragraphs.

128.     BCBSMA's actions in denying coverage for adolescents' OON RT based on the so-called

"educational setting" exclusion when in reality the denial basis was based on entirely different reasons, violates ERISA and the express terms of the ERISA-governed insurance policies and self-funded plans.

129.    BCBSMA violated the Secretary's ERISA claim regulations under 29 CFR § 2560.503-1(g) by choosing not to disclose the true reason BCBSMA had for its adverse-benefit determinations.

130.    BCBSMA made appealing adverse benefit determinations futile, because BCBSMA failed to disclose the true reason for its adverse benefit determinations.

131.    BCBSMA violated the Secretary's ERISA claim regulations under 29 CFR § 2560.503-1(h) and (j) by failing to afford full and fair review of its adverse benefit determinations. BCBSMA violated the requirement to provide Plaintiffs and the Class with a full and fair review under Section 503 of ERISA, 29 U.S.C. § 1133(1) and (2) by failing to disclose the true reason for its adverse benefit determination and affording a full and fair review of the decision.

132.    BCBSMA's actions have harmed Plaintiffs and the Class because BCBSMA never afforded them a full and fair review under ERISA, opting instead to mislead them about their coverage denials and leave them with no chance for success on appeal.

133.    As a result of BCBSMA's actions, BCBSMA has unlawfully denied coverage for Plaintiffs and the Classes' OON RT claims.

134.    BCBSMA's actions constitute an unlawful denial of health insurance benefits under ERISA, as provided in 29 U.S.C. § 1132(a)(1)(B).

135.    BCBSMA unlawfully denied Plaintiffs and the Class's benefits, in part, by denying them the full and fair review of their decisions to deny their claim for benefits, as outlined above.

136.    The Plaintiffs and the Class are entitled to declaratory judgment and an injunction requiring

that BCBSMA administer their ERISA-governed health insurance policies and self-funded plans in compliance with ERISA and the terms of the contracts. This may be achieved by remanding their claims to BCBSMA to administer the claims in a manner consistent with ERISA and its implementing regulations.

## SECOND CAUSE OF ACTION
### (Claim for Appropriate Equitable Relief under 29 U.S.C. §1132(a)(3))

137.     Plaintiffs restate and reallege all prior paragraphs.

138.     Plaintiffs and the Class are entitled to declaratory judgment and injunctive relief.

139.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

140.     Due to the fiduciary breaches perpetrated by BCBSMA, including without limitation, the issuance of misleading denial letters, Plaintiffs and the Class are entitled to other equitable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

141.     Plaintiffs and the Class members seek this Court's order that they are entitled to appropriate equitable relief under 29 U.S.C. §1132(a)(3), including injunctive relief prohibiting past and future violations of ERISA relating to ERISA notice requirements; fulfilling ERISA requirements demanding full and fair review of denied claims; truthfully dealing with participants at all times; appointing a monitor to assure ERISA compliance; and all other make-whole equitable relief.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class, pray for judgment against BCBSMA as follows:

1.  For an Order certifying the proposed Class under F.R.C P. 23(b)(1) and (b)(2);

2. For the relief outlined in the First and Second Causes of Action outlined above;

3. For an injunction against the Defendants, and each of them, preventing further violations of their fiduciary responsibilities, obligations and duties;

4. For an Order that the Defendants provide other appropriate equitable relief to the Plaintiffs and Class, including but not limited to: fulfilling ERISA requirements demanding full and fair review of denied claims, truthfully dealing with participants at all times; appointing a special master to monitor and ensure ERISA compliance, an accounting for profits, imposing other traditional equitable remedies to avoid injustice and to make the Plaintiffs and the Class whole;

5. For an Order that Defendants undergo training and monitoring under a special master appointed by the Court to avoid further ERISA violations;

6. For declaratory relief and an injunction directing BCBSMA to reprocess all Class members' OON RT coverage requests denied, at least in part, on the so-called "educational setting" exclusion and reinstate all administrative appeal rights under ERISA in connection therewith, pay interest on such approved claims, and perform these functions under the supervision of a Court appointed special master;

7. An award of costs and attorneys' fees available under law or statute including 29 U.S.C. §1132(g) and Rule 23; and

8. For such further relief as the Court deems equitable in the case.


Dated: May 17, 2021                                     THE   PLAINTIFFS,   BY
                                                         THEIR ATTORNEYS,

                                                          */s/ Sean K. Collins*
                                                         _____

                                                          Sean K. Collins
                                                          B.B.O. # 687158

Law Offices of
Sean K. Collins
184 High Street, Suite 503
Boston, MA 02110
Telephone: 855-693-9256
Fax: 617-227-2843
sean@neinsurancelaw.com

Jonathan M. Feigenbaum
B.B.O. #546686
Law Offices of
Jonathan M. Feigenbaum
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617-357-9700
Fax: 617-227-2843
jonathan@erisaattorneys.com

Brian S. King (PHV)
Brian S. King,
Attorney at Law
336 South 300 East,
Suite 200
Salt Lake City, UT 84111
Telephone: 801-532-1739
Fax:   801-532-1936
brian@briansking.com

Ex Kano S. Sams II (PHV)
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Fax: 310-201-9160
esams@glancylaw.com

Mala M. Rafik
B.B.O. # 638075
Rosenfeld & Rafik, P.C.
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617-723-7470
Fax: 617-227-2843
mmr@rosenfeld.com

*Attorneys for Plaintiffs and the
Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below my signature, a copy of the foregoing was electronically filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system. Parties not registered with the Court's electronic filing system will be served this same day by First Class U.S. Mail.

/s/Sean K. Collins
Dated: May 17, 2021