# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRENT S., ANGIE S., J.B., R.B., A.F., C.S., H.S., STEVE C., KELLY W., JANE DOE, and M.L. individually and as representatives of classes of similarly situated individuals,<br><br>PLAINTIFFS,<br><br>vs.<br><br>BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC., and BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.<br><br>DEFENDANTS. | CIVIL ACTION NO. 17-11569-ADB |

## FOURTH AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

Brent S. ("Brent"), and Angie S. ("Angie") (parents of "Jake"), J.B. and R.B. (parents of "D.B."), A.F. (father of "J.F."), C.S. and H.S. (parents of "E.S."), Steve C., Kelley W. and their daughter Jane Doe, and M.L. (mother of "S.L.") (collectively "Plaintiffs"), individually and as representatives of the Class [1] of similarly situated individuals, complain and allege against Defendants Blue Cross and Blue Shield of Massachusetts, Inc. ("Blue Cross, Inc.") and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("HMO Blue") (collectively "BCBSMA" or "Defendants") violated the Employee Retirement Income Security Act of 1974 ("ERISA") and the Secretary of Labor ERISA claim regulations, as well as the terms of insurance policies and state

---

[1] The capitalized term "Class" used throughout is defined below under the "**CLASS ALLEGATIONS**" header.

law.[2]

This case seeks to correct the systemic practice employed by BCBSMA of denying or limiting inpatient intermediate mental health residential treatment by asserting that BCBSMA's policies only cover "acute residential treatment" when that practice (1) is not permitted under the language of the policies and (2) violates the requirements of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") since no equivalent restriction is placed on intermediate levels of non-mental health treatment such as inpatient stays at skilled nursing facilities or rehabilitation facilities.

BCBSMA engaged in a systematic practice of deceiving families when denying their children coverage for mental health out-of-network residential treatment ("OON RT") under health care benefit plans, either insured or administered by BCBSMA, by misleadingly citing to so-called exclusions in coverage denial letters rather than the true specific bases for the denial.

When rendering an adverse-benefit determination, the Secretary's ERISA regulations impose on BCBSMA a duty to disclose: "(i)The specific reason or reasons for the adverse determination"; "(ii) Reference to the specific plan provisions on which the determination is based"; and "(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See* 29 C.F.R. § 2560.503–1(g)(1). Because BCBSMA failed to provide each Plaintiff and the Class with the specific information and bases for denying the residential treatment they required to address their often times life-threatening mental illness, BCBSMA violated their right to a "full and fair review" under ERISA. 29 U.S.C. § 1133(1).

Similarly, Massachusetts law requires that an adverse determination "identify the specific

---

[2] The allegations made in this Fourth Amended Class Action Complaint are based upon the evidence obtained during discovery and the experience of the Plaintiffs.

information upon which the Adverse Determination was based shall (sic) explain the reason for any denial, including the specific Utilization Review criteria or Benefits provisions used in the determination[.]" 211 Mass. Code Regs. 52.07. The policies themselves also require that if "Blue Cross and Blue Shield makes a decision to deny or reduce authorization of a service, you will receive a letter that explains the reason for the denial or reduction."

BCBSMA's policies provide coverage for inpatient intermediate residential treatment of mental health and substance use disorders. However, BCBSMA interprets the language of the policies in a way that improperly limits that coverage to only what it characterizes as "acute residential treatment" to the exclusion of sub-acute residential treatment that is medically necessary.

## **PARTIES**

1.      Plaintiffs Brent and Angie are individuals residing in Douglas County, Colorado. Brent and Angie are citizens of Colorado.  Brent, Angie, and their son Jake are participants under a Blue Cross, Inc. ERISA administered and governed self-funded health plan provided by Brent's private sector employer.

2.      Plaintiffs J.B. and R.B. are individuals residing in, and citizens of, New Hampshire. J.B., R.B. and D.B. participants under a Blue Cross, Inc. ERISA governed health insurance policy provided by R.B.'s private sector employer. The applicable BCBSMA case number is 99155AKE00.

3.      Plaintiff A.F. is an individual residing in, and a citizen of, Colorado.  A.F. and his daughter J.F. are participants under a Blue Cross, Inc. ERISA governed health insurance policy provided by A.F.'s private sector employer. The applicable BCBSMA case number is 99207E5Z00.

4.      Plaintiffs C.S. and H.S. are individuals residing in, and citizens of, Massachusetts. C.S., H.S. and their son E.S. are participants under an HMO Blue ERISA governed health insurance policy provided by C.S.'s private sector employer. The applicable BCBSMA case number is 99134EHB00.

5.      Plaintiffs Steve, Kelly, and Jane are citizens of Norfolk County in the Commonwealth of Massachusetts. Steve and Kelly are Jane's parents and insurance coverage is provided to them through a fully insured employee welfare benefits plan provided through Steve and Kelly's employment. Jane was a beneficiary of the employee welfare benefits plan. Steve holds a power of attorney on Jane's behalf.

6.      Plaintiff M. L. is a citizen of Massachusetts. M.L. paid for her daughter S.L.'s residential treatment care. Plaintiff M.L.'s insurance coverage was provided to her and her daughter S.L. under a non-ERISA governed individual health insurance policy insured by BCBSMA.

7.      Defendant Blue Cross, Inc. is a Massachusetts corporation organized and existing under General Laws chapter 180 having a usual place of business at 101 Huntington Avenue, Boston, Suffolk County, Massachusetts. Blue Cross, Inc. is a citizen of Massachusetts.

8.      Defendant HMO Blue is a Massachusetts corporation organized and existing under General Laws chapter 180 having a usual place of business at 101 Huntington Avenue, Boston, Suffolk County, Massachusetts. HMO Blue is a citizen of Massachusetts.

## THE INTERLOCKING RELATIONSHIP AMONG DEFENDANTS

9.      Defendant HMO Blue, is a wholly owned subsidiary of Defendant Blue Cross, Inc. Defendant HMO Blue is also "wholly-controlled" by Blue Cross, Inc. as admitted by Defendants in their Internal Revenue Service filings:

> BLUE CROSS BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC. ("HMO BLUE") IS A WHOLLY-CONTROLLED SUBSIDIARY ORGANIZATION OF BLUE CROSS AND BLUE SHIELD OF

MASSACHUSETTS, INC. ("BCBSMA"). THE BOARD OF DIRECTORS OF HMO BLUE IS LARGELY MADE UP OF OFFICERS OF BCBSMA. HMO BLUE BOARD MEMBERS ARE APPROVED, APPOINTED AND OPERATE UNDER THE DIRECTION BY/OF THE BOARD OF DIRECTORS OF BCBSMA, AN INDEPENDENT GOVERNING BODY.[3]

10.    As the HMO Blue IRS Form 990 discloses, Defendants share the same officers (CEO, CFO, COO, Treasurer, Chief Legal Officer, Vice President, Assistant Treasurer) as well as even the same physician file reviewers.[4]  In addition most of the officers of HMO Blue, who are also officers of Blue Cross, Inc., receive compensation entirely from Blue Cross, Inc. with no reportable compensation disclosed by HMO Blue.[5]

11.    As disclosed by Blue Cross, Inc., in its consolidated financial statements, "HMO Blue and [Blue Cross, Inc.] operate under common Board of Directors management and control."[6] HMO Blue has no employees who are not also employed by Blue Cross, Inc., "Employees of the Companies [i.e. collectively Blue Cross, Inc. and HMO Blue] (the "Associates") are either: concurrently employed by the Companies or solely employed by [Blue Cross, Inc.][.]"[7]

12.    Because the actions and omissions of Blue Cross, Inc. are also the actions of HMO Blue, and *vice versa*, Defendants are collectively called BCBSMA, or Defendants, throughout this Third Amended Class Action Complaint.

## JURISDICTION AND VENUE

13.    The BCBSMA health insurance policies, and the self-funded plans it administers, are governed by ERISA, 29 U.S.C. § 1001, *et. seq.*

---

[3]    *See*    HMO    Blue's    IRS    Form    990    for    2017: https://990s.foundationcenter.org/990_pdf_archive/043/043362283/043362283_201712_990O.pdf at p. 35.
[4] *Id*. at 9-10.
[5] *Id*.
[6] Blue Cross and Blue Shield of Massachusetts, Inc. Years Ended December 31, 2018 and 2017 Audited Financial Statements, https://aboutus.bluecrossma.com/sites/g/files/csphws1376/files/PDFs/BCBSMA%20Inc.%20AFS%204.25.19%20-%20with%20Supplementary%20Information.pdf at 56.
[7] *Id* at 57.

14.     BCBSMA acted as a fiduciary, as that term is defined at 29 U.S.C. § 1002(21), under the ERISA plans subject to this lawsuit.

15.     This Court has jurisdiction over this matter under 29 U.S.C. §1132(e)(1) and 28 U.S.C.§ 1331.

16.     Venue is proper under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) and (c), because BCBSMA is a citizen of Massachusetts, and administers ERISA welfare benefit plans in Massachusetts.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.     BCBSMA is one of the largest health insurers, and self-funded plan administrators, in the country.

18.     Under ERISA, BCBSMA must administer welfare benefit plans solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits and in accordance with the instruments that govern its health insurance policies and self-funded plans.

19.     BCBSMA has failed to meet its fiduciary duty to administer its plans, both insured and self-insured, in the best interests of the employees covered under those plans, and in particular, the employees' children suffering from mental illness.

20.     BCBSMA acknowledges that throughout the United States there is a mental health crisis impacting adolescents.

21.     On July 23, 2020 BCBSMA issued a press release in which Andrew Dreyfus, CEO of BCBSMA stated, "We know that far too many of our members – both children and adults -- are not getting the mental health care they deserve." Mr. Dreyfus continued, "Taken together, we believe these initiatives will help address a critical need at a time when access to high quality

mental health services has never been more important." [8]

22.     Because so few BCBSMA in-network providers offer adolescent residential mental health treatment, a transparent and fair process for adjudicating coverage of OON RT by BCBSMA is critical. That is why the issues raised in this litigation are so important.

**Relevant Policy Terms and the Template Benefit Denial Letters**

23.     BCBSMA refers to residential mental health treatment as "acute residential treatment" in the Class Policies.[9]

24.     When communicating administrative denials for OON RT, BCBSMA indicated to the Class in denial letters (both initial denial letters and post-appeal denial letters) that the program was a non-covered "educational program," an "educational facility and program," a "boarding school," a "therapeutic boarding school," a "non-covered provider type," or "not the type of residential programs which are covered," an "educational setting," a "residential therapeutic school," a "school setting," or a "sub-acute," "long term acute residential care," "wilderness," "vocational," "equine," "camp," "outward-bound," "ranch," or "recreational" facility that was excluded from coverage (collectively "Benefit Denial Letter(s)").

25.     BCBSMA maintained template Benefit Denial Letters for these bases during the Class Period. [10]

26.     BCBSMA did not disclose in these Benefit Denial Letters that a criteria was being utilized by clinicians exercising medical judgment.

27.     Coverage for residential treatment by BCBSMA is afforded under the Class Policies' "Intermediate Treatments" provision:

---

[8]   https://newsroom.bluecrossma.com/2020-07-23-Blue-Cross-Blue-Shield-of-Massachusetts-Announces-Bold-New-Action-To-Expand-Members-Access-to-Mental-Health-Services
[9] "Class Policy" or "Class Policies" refers to all commercial health insurance policies or self-funded plans that were underwritten or administered by BCBSMA, Inc. or BCBSMA HMO Blue.
[10] "Class Period" refers to the time period between January 1, 2014 and present.

**Intermediate Treatments**

There may be times when you will need *medically necessary* care that is more intensive than typical *outpatient* care. But, you do not need 24-hour *inpatient* hospital care. This "intermediate" care may include (but is not limited to):

- Acute residential treatment. Your coverage for this treatment is considered to be an *inpatient* benefit. During the *inpatient* pre-service review process (see Part 4), *Blue Cross and Blue Shield* will assess your specific health care needs. The least intensive type of setting that is required for your *mental condition* will be approved by *Blue Cross and Blue Shield*.
- Partial hospital programs or intensive outpatient programs. Your coverage for these programs is considered to be an *outpatient* benefit.

If you would normally pay a *copayment* for *inpatient* or *outpatient* benefits, the *copayment* will be waived when you get covered intermediate care. But, you must still pay your *deductible* and/or *coinsurance*, whichever applies.

28.     Coverage of a residential treatment stay, like those at issue here, under the Intermediate Treatments provision at the "inpatient" level includes coverage for all costs of care and room and board associated with the medically necessary stay.

29.     The Intermediate Treatments provision changed only slightly during the portion of the Class Period from 2015 through June 30, 2019.

30.     On July 1, 2019, BCBSMA finally defined "acute residential treatment" with an update to its standard policy form language, stating: "Acute residential treatment…These services may sometimes be referred to as sub-acute care services. These services offer 24 hours a day, 7 days a week access to medical services and on-site or on-call nursing staff."  However certain versions of the Benefit Denial Letters are still issued.

31.     During the Class Period, BCBSMA denied OON RT coverage when, in the clinical judgment of BCBSMA's utilization management with the direction and assistance of the physician and psychologist review unit, the requested program allegedly did not satisfy their confidential criteria the "Behavioral Health: Benefit Denial (BDEN) Evaluation and Treatment Criteria" ("BDEN/InterQual Criteria").

32.     The Benefit Denial Letters do not reference the BDEN/InterQual Criteria, the program specific facts that BCBSMA applied to the criteria, or the identity and credentials of who actually

made the coverage decision.

33.     The vast majority of the Benefit Denial Letters were purportedly signed by a child and adult psychiatrist when in fact this psychiatrist had no role in the decision and had demanded that BCBSMA stop using his signature. A request which was, incredibly, refused by BCBSMA.

### BCBSMA Engaged in a Systematic Practice of Issuing Misleading Coverage Determinations When Denying Residential Treatment Claims based on the Benefit Denial Letter Templates in Violation of ERISA and Massachusetts Law

34.     BCBSMA denied coverage and issued materially false adverse-benefit determination letters to participants who needed OON RT, stating the programs were denied based on the Benefit Denial Letter bases when in reality BCBSMA had different reasons for the denial.

35.     BCBSMA's Benefit Denial Letters issued to the Plaintiffs and the Class were misleading because the actual denial basis was that BCBSMA determined the facility did not meet the confidential and undisclosed BDEN/InterQual Criteria.

36.     If BCBSMA had been forthright with the Plaintiffs and Class, it would have disclosed its BDEN/InterQual Criteria, told the participant what specific information was gathered about the OON RT provider, and how that information was applied to the BDEN/InterQual Criteria in arriving at the coverage decision.

37.     Without knowing the real reason for the denial of their claim, offering meaningful evidence on appeal in what should be a non-adversarial process was impossible.

38.     When rendering an adverse-benefit determination, the Secretary of Labor ERISA regulations impose on BCBSMA a requirement to disclose: "(i)The specific reason or reasons for the adverse determination"; "(ii) Reference to the specific plan provisions on which the determination is based"; and "(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See* 29 C.F.R. § 2560.503–1(g)(1).

39.     Similarly, Massachusetts law requires that an adverse determination "identify the specific information upon which the Adverse Determination was based shall (sic) explain the reason for any denial, including the specific Utilization Review criteria or Benefits provisions used in the determination[.]" 211 Mass. Code Regs. 52.07.

40.     Under the Secretary of Labor ERISA claims regulations, the insurance policies and Massachusetts law, BCBSMA had an obligation to disclose the true reason for denying the claims, including: (1) the specific information BCBSMA gathered about the OON RT program, and the process for how that information was gathered; and (2) the BDEN/InterQual Criteria, and how BCBSMA evaluated the gathered information under the BDEN/InterQual Criteria.

41.     BCBSMA's election not to disclose the true reason(s) for denying the Class members' claims violated the central tenet of ERISA's implementing regulations.

42.     Under ERISA every benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. §1133.

43.     BCBSMA must disclose all internal rules, guidelines, protocols, memorandum, and training materials relating to the benefit denial at issue. *See* 29 CFR 2560.503-1(g)(1) (v).

44.     Section 29 C.F.R. 2560.503-1(h)(2)(iii) requires as part of a full and fair review of a benefit denial, disclosure of all documents "relevant" to a beneficiary's claim for benefits.

45.     A document is "relevant" as defined in section (m)(8)(ii) if it, "[w]as submitted, considered or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

46.     Section 29 C.F.R § 2560.503-1(m)(8)(iv) provides, "In the case of a group health plan or plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination."

47.     The BDEN/InterQual Criteria is a "guideline" or "similar criterion" which was "relied upon in making the adverse determination," that BCBSMA had an obligation to disclose under the Secretary of Labor ERISA claims regulations.

48.     BCBSMA employees use the BDEN/InterQual Criteria when assessing whether the level of intensity of the services offered by an OON RT provider rises to the level of coverable under the Intermediate Treatments provision in the Class Policies, thus making it a "guideline" or "similar criterion" that must be disclosed.

49.     Section 29 U.S.C. § 1024(b)(4), mandates disclosure of "other instruments under which the plan is established or operated" to plan participants upon request.

50.     The U.S. Department of Labor Advisory Opinion Letter 96-14a interprets 29 U.S.C. § 1024(b)(4) as follows:

> The legislative history of ERISA suggests that plan participants and beneficiaries should have access to documents that directly affect their benefit entitlements under an employee benefit plan. Consistent with this Congressional intent, it is the view of the Department of Labor that, for purposes of section 104(b)(2) and 104(b)(4), any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement under an employee benefit plan would constitute an instrument under which the plan is established or operated, regardless of whether such information is contained in a document designated as the "plan document." Accordingly, studies, schedules or similar documents that contain information and data, such as information and data relating to standard charges for specific medical or surgical procedures, that, in turn, serve as the basis for determining or calculating a participant's or beneficiary's benefit entitlements under an employee benefit plan would constitute "instruments under which the plan is . . . operated."

51.     The BDEN/InterQual Criteria is an instrument that "serve as the basis for determining . . .

a participant's or beneficiary's benefit entitlement" that BCBSMA was required to disclose to participants but did not.

52.     The purpose of ERISA's full and fair review requirement is to provide claimants with sufficient information to prepare adequately for the internal appeal, or an appeal to a court.

53.     Without the BDEN/InterQual Criteria and the related information gathered by BCBSMA about their OON RT programs, the Class was denied information sufficient to understand the bases for their denials and to prepare for their appeals, or to appeal to the courts under ERISA and the terms of their insurance contracts.

54.     Full and fair review under ERISA includes "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (quoting *Grossmuller v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 715 F.2d 853, 858 n.5 (3d Cir. 1983)).

55.     By withholding the BDEN/InterQual Criteria from the Class, along with the information gathered when assessing coverage against the BDEN/InterQual Criteria, BCBSMA violated its duty to act in the best interests of plan participants.

56.     To add credibility to adverse-benefit determination letters, for the majority of the so-far identified Class members, BCBSMA attached the signature of a nationally recognized and prominent BCBSMA child psychiatrist who was not involved in the coverage determinations.

57.     The physician's signature falsely implied that this child-psychiatrist, with a national reputation for mental health advocacy, had reviewed the family's request for care and the specifics of the program requested, and that this psychiatrist concluded that the requested coverage was unavailable under the policy.

58.     The child-psychiatrist had not reviewed any of the Plaintiffs' or Class members' claims.

59.     Often, no physician at all reviewed the request for coverage.

60.     BCBSMA attached the psychiatrist's signature to adverse-benefit determination letters only after this psychiatrist left his role that focused on coverage decisions and took a prominent public position as a spokesperson for BCBSMA on mental health care.

61.     The child psychiatrist never authorized BCBSMA to sign his name.

62.     The child psychiatrist, to his credit, spent several years demanding that BCBSMA stop the deceptive practice of using his name and signature on the denial letters.

63.     A statutory fiduciary violates its fiduciary obligation by misleading a plan participant.

64.     BCBSMA's testimony, internal emails, and telephone call recordings between BCBSMA and the OON RT providers about Class members confirm that BCBSMA assessed the level of intensity provided by the program at issue against its withheld BDEN/InterQual Criteria during the Class Period, and that the Benefit Denial Letter bases were not the real reason(s) for the adverse-benefit determination.

65.     BCBSMA withheld this information from the Plaintiffs and Class during the ERISA internal appeals process in violation of ERISA's implementing regulations as well as the terms of the insurance polices.

### The Plaintiffs' Claims

66.     Jake received treatment for his mental health disorders at Ashcreek Ranch Academy ("ARA"), a licensed residential treatment program in Washington County, Utah from March 13, 2014 through January 24, 2015. During this 10-month time period, Jake was 17 years old.

67.     Jake struggled with mental health problems involving suicidal thoughts, self-esteem, and substance abuse for several years before being admitted to ARA.

68.     Jake began smoking marijuana when he was thirteen. In the months before his admission

to ARA, Jake had progressed to using various pills, cocaine, and heroin. He was depressed and ashamed about his behavior and the problems he was causing friends and family. He was prescribed with an anti-depressant and, later, a mood stabilizer.

69.     Before his admission to ARA, Jake had been involved in a number of physical assaults with others, including with Brent. He had also been brought into the juvenile justice system based on substance abuse and his assaults.

70.     Jake ran away from home during this time frame. After three days he contacted his mother and told her he was OK and came home a day later.

71.     Several months before being admitted to ARA Jake had been ordered by a juvenile court judge to receive mental health treatment for his substance abuse. He did well in rehabilitation for four months but then, immediately before his admission to ARA, relapsed and began using drugs again. Given the continuing deterioration, Brent and Angie, in consultation with and recommendations from Jake's health providers, arranged for treatment at ARA.

72.     Immediately before Jake's admission to ARA, he had been treated on an acute inpatient basis at Mountain Crest Behavioral Health Center ("MCBHC") in Fort Collins.

73.     At the time of his discharge from MCBHC, Brent and Angie had no ability to keep Jake from running away and either committing suicide or self-harming unless he was transferred directly to a sub-acute inpatient residential treatment setting. Health care professionals involved with Jake's treatment at MCBHC recommended residential treatment for Jake to treat his mental health disorders. Brent drove Jake directly to ARA from MCBHC in March, 2014.

74.     Jake was 17 years old at the time of his admission to ARA.

75.     ARA was licensed with the Utah State Department of Human Services to provide residential treatment for adolescents during the entire time Jake was treated at ARA. Copies of

ARA's licenses during the time Jake was treated were provided to BCBSMA by both Brent and Angie and ARA during the pre-litigation appeal process for this case. ARA's licensure and the services it provided to its patients fall within the coverage provisions of Jake's health insurance policy.

76.     Authorization was requested from BCBSMA for coverage of Jake's treatment at ARA. In addition, claims were submitted to BCBSMA for coverage of Jake's treatment at ARA.

77.     On February 25, 2015, BCBSMA denied Jake's claim for coverage of his treatment at ARA, citing to a so-called "ranch" exclusion.

78.     Brent appealed the denial of coverage on April 15, 2015.

79.     BCBSMA again denied Jake's claim on May 14, 2015. In this denial, BCBSMA asserted that the sole basis for the claim denial was because "Ashcreek Ranch Academy is a residential treatment [sic] and boarding school. Ashcreek Ranch Academy is not a covered type of provider on your . . . Plan."

80.     Similar to Jake, 17-year-old D.B. struggled with mental health disorders such as depression, attention deficit-hyperactivity disorder, and oppositional defiant disorder.

81.     On advice of her treatment providers, D.B. moved inpatient to Ironwood Maine ("Ironwood"), a State of Maine licensed "Children's Residential Care Facility." D.B. resided at Ironwood from August 1, 2017 to August 6, 2018.

82.     BCBSMA denied D.B.'s initial claim for Ironwood on August 3, 2017, noting "[b]ased on the information publically available to us about this facility and program, including the web address HTTP://WWW.IRONWOODMAINE.COM/STAFF.HTML, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

83.     BCBSMA maintained its denial on appeal, explaining in a January 25, 2018 letter that, "although D.B. may have resided in or at a residential therapeutic school, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying this claim since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that D.B. qualified for at the time that she entered Ironwood Maine LLC."

84.     D.B.'s stay at Ironwood should have been covered by her BCBSMA policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

85.     Just like Jake and D.B., 13-year-old J.F. suffered from mental health disorders including a major depressive disorder and an anxiety disorder.

86.     On advice of her mental healthcare treatment providers, J.F. moved inpatient to Moonridge Academy ("Moonridge"), a State of Utah licensed "RESIDENTIAL TREATMENT" facility "FOR 16 YOUTH FEMALE CLIENTS AGES 12 TO 17[.]" J.F. resided at Moonridge from January 15, 2018 to November 29, 2018.

87.     BCBSMA denied J.F.'s initial claim for Moonridge on January 16, 2018, noting in verbatim fashion to D.B.'s initial denial, "[b]ased on the information publically available to us about this facility and program, including the web address http://www.moonridgeacademy.com/ADVENTURE-THERAPY, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

88.     J.F. appealed and on July 20, 2018 BCBSMA rendered a final adverse-benefit determination stating the identical language found in D.B.'s adverse-benefit determination letter

stating, "although J.F., may have resided in or at an educational program, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying these claims since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that J.F., qualified for at the time that she entered Moonridge Academy."

89.     J.F.'s stay at Moonridge should have been covered by her BCBSMA policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

90.     Just like Jake, D.B., and J.F., 14-year-old E.S. suffered from mental health disorders including attention-deficit/hyperactivity disorder.

91.     On advice of his treatment providers, E.S. moved inpatient to Maple Lake Academy for Boys ("Maple Lake"), a State of Utah licensed "RESIDENTIAL TREATMENT" facility "FOR 16 YOUTH MALE CLIENTS AGES 12 TO 17[.]" E.S. resided at Maple Lake from June 1, 2017 to January 22, 2019.

92.     BCBSMA denied E.S.'s initial claim for  residential mental health care treatment at Maple Lake on June 6, 2017, noting in verbatim fashion to D.B. and J.F.'s initial denial, "[b]ased on the information publically available to us about this facility and program, including the web address http://www.maplelakeacademy.com/, and information provided with this request the services requested are being rendered as part of (sic) Educational Facility and Program."

93.     E.S. appealed and on September 26, 2017 BCBSMA rendered an adverse-benefit determination using near verbatim language as J.F. and D.B.'s appeal denials quoted above, "although you, may have resided in or at an educational setting, these services are not the type of residential programs which are covered by your plan. Please also be aware that, while denying this

claim since the services do not constitute a covered benefit, we are not making a medical necessity judgment about the type of care that you qualified for at the time that you entered Maple Lake Academy for Boys."

94.     E.S. appealed again, and on December 19, 2017, BCBSMA issued its final adverse benefit determination stating "[w]e believe that our denial rationale is valid and that services received in an educational setting are in fact excluded from coverage under your plan[.]"

95.     E.S.'s stay at Maple Lake should have been covered by his HMO Blue policy as a qualifying adolescent residential treatment stay for a mental health disorder, but instead it was summarily denied without regard for medical necessity or the policy language.

96.     Jake, D.B., J.F., and E.S. all had claims improperly denied based on a so-called educational setting exclusion. In addition, their policies also contain an exception to this alleged educational setting exclusion (even if a valid exclusion was found to exist) for policyholders under 19 years old:

> No benefits are provided for exams, evaluations, ***or services that are performed solely for educational*** or developmental ***purposes. The only exceptions are for***…***treatment of mental conditions for enrolled dependents who are under age 19***[.] (emphasis added).

97.     BCBSMA ignored this exception to the so-called exclusion when denying adolescents' claims based on the "educational setting" denial basis.

98.     S.L. struggled with severe mental illness.

99.     Upon advice of her treatment providers, S.L. enrolled at Cornerstones of Maine ("Cornerstones") for mental health residential treatment.

100.    Cornerstones of Maine is a residential treatment program.

101.    M.L. sought residential treatment coverage for her daughter S.L.'s stay at Cornerstones

under their BCBSMA Policy however on December 30, 2020, BCBSMA issued a denial letter, stating that Cornerstones was a "non-covered provider type" and would not be covered.

102.    S.L. was not told that the actual policy provision her coverage was being assessed against was the Intermediate Treatments provision, specifically "acute residential treatment."

103.    S.L. was not told that BCBSMA's utilized the InterQual Criteria, as a proxy for "acute residential treatment" under her Policy, when assessing her coverage request against specific facts that BCBSMA had gathered about Cornerstones.

104.    S.L. was not told that the child psychiatrist whose signature appears on her denial letter actually never authorized the use of his signature on denial letters like S.L.'s and indeed had tried for years to get BCBSMA to stop using his signature prior to the issuance of S.L.'s letter in December 2020.

105.    The services provided to S.L. at Cornerstones were medically necessary and covered services under the Plan administered and insured by BCBSMA.

106.    S.L. appealed BCBSMA's adverse-benefit determination, without knowing the true bases that BCBSMA relied upon when initially denying her coverage.

107.    S.L.'s appeal was denied on March 19, 2021.

108.    M.L. paid in excess of $100,000 for S.L.'s treatment at Cornerstones and BCBSMA has refused to pay for this inpatient treatment.

109.    S.L.'s stay at Cornerstones should have been covered by her Class Policy as a qualifying inpatient residential treatment stay for a mental health disorder under the Intermediate Treatments provision at the inpatient coverage level, but instead it was summarily denied without regard for medical necessity or the policy language, in breach of the insurance policy.

110.    S.L. was not told about the Policy provision BCBSMA was actually assessing her claim

against, or the Interqual Criteria or the facts BCBSMA gathered when applying that criteria. She thus had no ability to appeal the true bases for BCBSMA's denial of her claim.

111.    S.L. was issued a template "non-covered provider type" denial letter that cites to an inapplicable policy provision, makes no reference to the InterQual Criteria or the facts BCBSMA used to assess her coverage against that Criteria. S.L.'s appeal was futile in that she did not know BCBSMA's true bases for denying her claim and therefore could not address these bases in her appeal, which was denied.

112.    M.L. has paid substantial sums of money for OON RT and BCBSMA has paid nothing despite its obligation to do so.

113.    Jane had problems with regulating her emotions from the time she was a young child.

114.    She struggled with anxiety, tantrums, and was easily overwhelmed.

115.    As she grew older, she began to see Dr. Meghan Cuff, a psychologist, who diagnosed her with depression, anxiety, and obsessive-compulsive disorder ("OCD"), among other mental health disorders.

116.    When Jane started high school her anxiety and OCD behaviors increased.

117.    Often Jane isolated herself in her bedroom and was withdrawn from her family.

118.    Notwithstanding treatment on an intensive outpatient basis from a variety of providers, Jane's symptoms of depression, anxiety, and OCD became more serious in early 2015.

119.    She experienced suicidal ideation and began cutting herself.

120.    In the Fall of 2015, she refused to take her medications and her depression and anxiety increased.

121.    Despite intensive efforts to stabilize her condition, Jane's condition continued to deteriorate.

122.     Jane's health care providers helped Steve and Kelly identify La Europa Academy ("La Europa") as a residential treatment center that would be a good match for Jane's 24 hour a day residential treatment needs.

123.     Jane received medical care and treatment at La Europa, a licensed residential treatment center in Utah that provides inpatient treatment to adolescents with mental health, behavioral, or substance abuse challenges.

124.     At all material times, La Europa was licensed by the State of Utah, Department of Human Services, as a residential treatment center pursuant to Utah Code Annotated, § 62A-101 et. seq.

125.     When Steve and Kelly informed Jane of their decision to send her to La Europa for care, she attempted suicide by ingesting a handful of anti-depressants she had been hiding in her room.

126.     After being stabilized over several days at a hospital in the Commonwealth of Massachusetts, and on the advice of her treatment team she was transported with an escort to La Europa and was admitted on February 26, 2016.

127.     La Europa and the services provided to Jane were medically necessary and covered services under the Plan administered and insured by BCBSMA.

128.     When Jane commenced treatment at La Europa Jane, she underwent a psychiatric evaluation. Medical professionals diagnosed her with "generalized anxiety disorder" and "parent-child relational problem."

129.     La Europa developed a "Master Treatment Plan" to address her diagnoses and conditions. Care at La Europa included professional services from licensed clinicians applying individual therapy, group therapy, family therapy, and a variety of clinical and behavioral treatments, including medical and medication management. La Europa provided treatment to Jane in accordance with generally accepted standards of medical practice.

130.    Steve and Kelly submitted claims for Jane's treatment at La Europa, and initially BCBSMA agreed to pay the first 16 days of Jane's care at La Europa.

131.    After March 14, 2016, BCBSMA denied coverage asserting that Jane's treatment was not medically necessary.

132.    BCBSMA in violation of law refused to pay for, or approve payment for, healthcare services provided by La Europa to Jane, that was medically necessary and covered services under the Plan

133.    BCBSMA issued an adverse-benefit determination on March 31, 2016 stating that Jane's care was not medically necessary.

134.     Jane appealed BCBSMA's adverse-benefit determination.

135.     BCBSMA issued a final adverse-benefit determination dated October 31, 2016 citing a new denial basis - refusing to provide for Jane's expenses in connection with her treatment at La Europa because in BCBSMA's view, La Europa is a non-covered "sub-acute" program.

136.    Steve and Kelly paid in excess of $185,000 for Jane's treatment at La Europa that BCBSMA should have paid but refused to pay.

137.    Steve and Kelly, on behalf of themselves and their daughter Jane, exhausted their pre-litigation appeals under the Plan and ERISA.

138.    BCBSMA may only assert defenses specifically set-forth in its final adverse-benefit determination dated October 31, 2016 for Plaintiff's claims arising under 29 U.S.C. §1132(a)(1)(B).

139.    Jane Doe's stay at La Europa should have been covered by her Class Policy as a qualifying inpatient residential treatment stay for a mental health disorder under the Intermediate Treatments provision, but instead it was summarily denied without regard for medical necessity or the policy

language.

140.    None of the Plaintiffs were told about the BDEN/InterQual Criteria. None of the Plaintiffs were told about the information BCBSMA gathered from their OON RT programs and applied against the BDEN/InterQual Criteria. All Plaintiffs were issued misleading Benefit Denial Letters and not provided with the true bases for the coverage decline. Plaintiffs have exhausted their ERISA pre-litigation appeal obligations under the ERISA plan instruments, where applicable, before filing this action, and even if they had not, the appeals were futile. Plaintiffs have paid substantial sums of money for OON RT for Jake, D.B., J.F., E.S., S.L. and Jane and BCBSMA has paid nothing.

## **CLASS ALLEGATIONS**

141.    The common thread among all six lead Plaintiff families and the Class members is that they received an adverse-benefit determination for an OON RT provider from BCBSMA - a templated Benefit Denial Letter.

142.    No Benefit Denial Letter sent to a Class member disclosed that (a) the OON RT provider did not comply with BCBSMA's undisclosed BDEN/InterQual Criteria; and (b) the specifics of the information about the OON RT that BCBSMA had gathered and assessed against the BDEN/InterQual Criteria, thus making it impossible for the Plaintiffs and the Class to challenge the accuracy of the information BCBSMA relied upon in rendering its adverse benefit decision.

143.    BCBSMA's systematic actions in violation of ERISA and the terms of the health insurance policies and self-funded plans, as outlined above, are breaches of its fiduciary duties to the participants and their beneficiaries under 29 U.S.C. §§ 1104(a)(1)(A) and (a)(1)(D) and of the policies' contractual terms.

144.    There are at least 100 Class members who received Benefit Denial Letters.

145.    Plaintiffs seek certification of the following class under F.R.C.P 23(b)(1) and (b)(2):

"Class": Individuals who (1) were covered by a commercial health insurance policy or self-funded plan that was underwritten or administered by BCBSMA, Inc. or BCBSMA HMO Blue ("Class Policy") during the period from January 1, 2014 through present (the "Class Period"); (2) received services or planned to receive services at a behavioral health residential provider, facility, or program ("Residential Program") that was out-of-network at the time the services in question were provided or sought; and (3) were issued an initial letter or letter following an appeal ("Benefit Denial Letter") by BCBSMA denying coverage or benefits for residential services at a Residential Program during the Class Period, which letter stated that BCBSMA denied coverage or benefits, at least in part, because the Residential Program was an "educational program," an "educational facility and program," a "boarding school," a "therapeutic boarding school," a "non-covered provider type," or "not the type of residential programs which are covered," an "educational setting," a "residential therapeutic school," a "school setting," or a "sub-acute," "long term acute residential care," "wilderness," "vocational," "equine," "camp," "outward-bound," "ranch," or "recreational" facility that was excluded from coverage.[11]

146.    The requirements for certification of a class under F.R.C.P 23(b)(1) and (b)(2) have been met.

147.    Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. Here, BCBSMA has produced over 100 Benefit Denial Letters for the Class.

148.    100, at minimum, is a sufficiently numerous class.

149.    Rule 23(a)(2) requires that there be questions of law or fact that are common to the Class.

150.    Both claims asserted below raise at least one common issue arising out of BCBSMA issuing misleading denial letters to all Class members: does BCBSMA's use of Benefit Denial Letters, and concomitant omission of the BDEN/InterQual Criteria actually considered for coverage, violate ERISA's disclosure and full and fair review requirements, as well as

---

[11] Excluded from the Class are (a) any individual that previously entered into an applicable settlement and release of claims with BCBSMA; (b) any individual whose applicable claims previously were dismissed with prejudice; (c) any individual for whom BCBSMA paid or who BCBSMA reimbursed for the full benefits available under the Class Policy for residential services provided by the Residential Program; (d) any individual whose claim(s) or request(s) for authorization was/were denied following an appeal on the sole basis that the Residential Program services in question were not medically necessary; (e) the Court, the Court's immediate family, Court staff; and (f) counsel of record for the Parties and their respective law firms.

Massachusetts law and the terms of the policies?

151.    This issue satisfies the test for commonality because its determination will resolve an issue central to BCBSMA's liability in one stroke.

152.    Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

153.    Like Plaintiffs, the Class members have all suffered "the same or similar injury": they were all issued a misleading Benefit Denial Letter.

154.    This common injury springs from the same "uniform course of conduct," namely: BCBSMA delivered to the Class members materially misleading template Benefit Denial Letters.

155.    Rule 23(a) requires that Plaintiffs demonstrate that they will fairly and adequately protect the interests of the Class.

156.    Plaintiffs' interests are co-extensive and do not conflict with the proposed Class members' interests and are typical of the claims of the other Class members.

157.    Plaintiffs have an interest in vigorously prosecuting this case on behalf of the proposed Class because they seek to have their claims remanded to BCBSMA so that their claims may be reprocessed in accordance with ERISA's full and fair review mandate and under Massachusetts law. This explicitly advances the interests of the Class in lockstep.

158.    Likewise, Class counsel selected by Plaintiffs will continue to vigorously prosecute this action on behalf of the Class. Class counsel has significant experience in ERISA governed health insurance litigation and insurance focused consumer class litigation.

159.    A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions … would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the

class." Fed.R.Civ.P. 23(b)(1)(A).

160.    That is precisely the situation here. If the 100 already identified Class members/Plaintiffs were to file separate lawsuits all over the country seeking injunctive relief, some courts may tell BCBSMA it violated ERISA and order an injunction, whereas other courts could potentially find BCBSMA's conduct permissible. Pursuit of similar claims for systemic reform through multiple individual suits would not only be inefficient, it would create a risk that different courts might order divergent or even conflicting relief.

161.    Certification is also proper pursuant to Rule 23(b)(1)(B), which requires a showing that "adjudications with respect to individual class members … would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). ERISA requires that, where appropriate, plan provisions must be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).

162.    If this Court were to find BCBSMA's policies require BCBSMA to act in a certain fashion, ERISA would require BCBSMA to act in a similar fashion toward all beneficiaries—the quintessential (b)(1)(B) scenario.

163.    A class is proper under Rule 23(b)(2) if the party opposing the class has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole…" Fed.R.Civ.P. 23(b)(2).

164.    Plaintiffs and the Class members are all seeking declaratory and injunctive relief to remedy the same conduct on the part of BCBSMA: an order that BCBSMA's practice of issuing misleading Benefit Denial Letters, rather than explaining the specifics of the criteria and information BCBSMA actually assessed, violated ERISA, Massachusetts law, and the policies, and a class

wide remand should be ordered.

165.    Finally, a proposed class is ascertainable if it is well defined and membership turns on objective criteria.

166.    Plaintiffs have identified the specific "objective criteria" here as the language BCBSMA used in its Benefit Denial Letters and incorporated them into the Class definition. Given that BCBSMA stores initial OON RT provider denial letters on its databases in text searchable word format, BCBSMA needs to run searches for that language in the applicable sub-folders to identify all of the Class members, and a similar process can be run in their appeal denial records.

167.    In addition, a manual review searching for these terms can be performed against all OON RT coverage requests denied during the Class Period under a Class Policy.

### FIRST CAUSE OF ACTION
### (Claim for Benefits under 29 U.S.C. §1132(a)(1)(B))

168.    Plaintiffs restate and reallege all prior paragraphs.

169.    BCBSMA's actions in denying coverage for OON RT based on the Benefit Denial Letter basis when in reality the denial basis was based on entirely different reasons, violates ERISA and the express terms of the ERISA-governed insurance policies and self-funded plans.

170.    BCBSMA violated the Secretary's ERISA claim regulations under 29 CFR § 2560.503-1(g) by choosing not to disclose the true reason BCBSMA had for its adverse-benefit determinations.

171.    BCBSMA made appealing adverse benefit determinations futile, because BCBSMA failed to disclose the true reason for its adverse benefit determinations.

172.    BCBSMA violated the Secretary's ERISA claim regulations under 29 CFR § 2560.503-1(h) and (j) by failing to afford full and fair of its adverse benefit determinations. BCBSMA violated the requirement to provide Plaintiffs and the Class with a full and fair review under

Section 503 of ERISA, 29 U.S.C. § 1133(1) and (2) by failing to disclose the true reason for its adverse benefit determination and affording a full and fair review of the decision.

173.     BCBSMA's actions have harmed Plaintiffs and the Class because BCBSMA never afforded them a full and fair review under ERISA, opting instead to mislead them about their coverage denials and leave them with no chance for success on appeal.

174.     As a result of BCBSMA's actions, BCBSMA has unlawfully denied coverage for Plaintiffs and the Classes' OON RT claims.

175.     BCBSMA's actions constitute an unlawful denial of health insurance benefits under ERISA, as provided in 29 U.S.C. § 1132(a)(1)(B).

176.     BCBSMA unlawfully denied Plaintiffs and the Class's benefits, in part, by denying them the full and fair review of their decisions to deny their claim for benefits, as outlined above.

177.     The Plaintiffs and the Class are entitled to declaratory judgment and an injunction requiring that BCBSMA administer their ERISA-governed health insurance policies and self-funded plans in compliance with ERISA and the terms of the contracts. This may be achieved by remanding their claims to BCBSMA to administer the claims in a manner consistent with ERISA and its implementing regulations.

**SECOND CAUSE OF ACTION**
**(Claim for Appropriate Equitable Relief under 29 U.S.C. §1132(a)(3))**

178.     Plaintiffs restate and reallege all prior paragraphs.

179.     Plaintiffs and the Class are entitled to declaratory judgment and injunctive relief.

180.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

181.    Due to the fiduciary breaches perpetrated by BCBSMA, including without limitation, the issuance of misleading denial letters, Plaintiffs and the Class are entitled to other equitable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

182.    Plaintiffs and the Class members seek this Court's order that they are entitled to appropriate equitable relief under 29 U.S.C. §1132(a)(3), including injunctive relief prohibiting past and future violations of ERISA relating to ERISA notice requirements; fulfilling ERISA requirements demanding full and fair review of denied claims; truthfully dealing with participants at all times; appointing a monitor to assure ERISA compliance; and all other make-whole equitable relief.

### THIRD CAUSE OF ACTION
### (Claim for Violation of MHPAEA 29 U.S.C. §1132(a)(3))

183.    Plaintiffs incorporate by reference all allegations above as if fully set forth herein.

184.    The federal MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

185.    In general, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than ERISA plan provide for treatment of medical or surgical disorders.

186.    Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical or surgical benefits and also make unlawful separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

187.    Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other

criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

188.     Comparable benefits offered by the Class Policies for intermediate medical or surgical treatment analogous to the benefits the Class Policies excluded Plaintiffs' treatment (and the similar excluded treatments of all proposed class members) include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of intermediate treatment does BCBSMA exclude coverage on the basis that only "acute" inpatient treatment stays are covered.

189.     Although treatment at skilled nursing facilities, rehabilitation hospitals, and mental health residential treatment facilities is covered under the policies, only in the case of residential mental health treatment facilities does BCBSMA limit coverage to "acute residential treatment."

190.     The effect of BCBSMA's overly restrictive interpretation of the "Intermediate Treatments" language of the plan document relating to mental health disorders is to routinely deny all mental health residential treatment claims that it deems as not "acute" irrespective of medical necessity. This is contrary to the definition of "medically necessary" treatment and generally accepted standard of professional medical practice. It is also contrary to the express language of the "Intermediate Treatments" clause of the polices that state coverage for intermediate mental health and substance use disorder treatment "may include (but is not limited to) . . . [a]cute residential treatment."

191.     The actions of BCBSMA in only affording coverage of "acute residential treatment" to the exclusion of sub-acute residential treatment in various settings, when assessing mental health claims for inpatient intermediate treatment, violates MHPAEA because BCBSMA's interpretation of the Class Policies does not similarly exclude coverage for individuals receiving treatment at

sub-acute inpatient facilities, such as skilled nursing facilities, for medical or surgical conditions.

192.    In this manner, BCBSMA violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the

Class Policies and the medical necessity criteria utilized by the Class Policies and BCBSMA, as

written or in operation, use processes, strategies, standards, or other factors to limit coverage for

mental health or substance use disorder treatment in a way that is inconsistent with, and more

stringently applied, than the processes, strategies, standards or other factors used to limit coverage

for medical/surgical treatment in the same classification. The violations of MHPAEA by

BCBSMA give the Plaintiffs and other BCBSMA insureds who have been likewise aggrieved, the

right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including,

but not limited to: surcharge, estoppel, restitution, disgorgement, injunction, accounting,

constructive trust, equitable lien, declaratory relief, unjust enrichment, and specific performance,

together with prejudgment interest pursuant allowed by law, and attorney fees and costs pursuant

to 29 U.S.C. §1132(g).

### FOURTH CAUSE OF ACTION
### (Breach of Contract)
### (on behalf of the Non-ERISA Class Members)

193.    Plaintiffs restate and reallege all prior paragraphs.

194.    For M.L. and certain other Class members whose insurance policies are not governed by

ERISA but rather state law, their insurance policies were breached based on BCBSMA's conduct

as described above, and they were harmed as a result.

195.    Minimum standards under Massachusetts law for health insurance policies are incorporated

into the terms of the policies.

196.    One such minimum standard is that adverse determinations must "identify the specific

information upon which the Adverse Determination was based shall (sic) explain the reason for

any denial, including the specific Utilization Review criteria or Benefits provisions used in the determination[.]" 211 Mass. Code Regs. 52.07.

197.    BCBSMA failure to satisfy this requirement when issuing the Benefit Denial Letters violated Massachusetts law and thus the terms of the policy which incorporate these minimum standards.

198.    The policies themselves also provide that denial letters will "explain[] the reason for the denial or reduction." The Benefit Denial Letters, as explained above, did not do that and therefore breached the terms of the contracts.

## **<u>REQUESTED RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class, pray for judgment against BCBSMA as follows:

1.  For an Order certifying the proposed Class under F.R.C P. 23(b)(1) and (b)(2);

2.  For the relief outlined in the First, Second and Third Causes of Action outlined above;

3.  For an injunction against the Defendants, and each of them, preventing further violations of their fiduciary responsibilities, obligations and duties under ERISA and Massachusetts law;

4.  For an Order that the Defendants provide other appropriate equitable relief to the Plaintiffs and Class, including but not limited to: fulfilling ERISA requirements demanding full and fair review of denied claims, truthfully dealing with participants at all times; appointing a special master to monitor and ensure ERISA compliance, an accounting for profits, imposing other traditional equitable remedies to avoid injustice and to make the Plaintiffs and the Class whole;

5. For an Order that Defendants undergo training and monitoring under a special master appointed by the Court to avoid further ERISA and Massachusetts law violations;

6. For declaratory relief and an injunction directing BCBSMA to reprocess all Class members' OON RT coverage requests denied in a Benefit Denial Letter and reinstate all administrative appeal rights under ERISA in connection therewith, pay interest on such approved claims, and perform these functions under the supervision of a Court appointed special master;

7. An award of costs and attorneys' fees available under law or statute including 29 U.S.C. §1132(g) and Rule 23; and

8. For such further relief as the Court deems equitable in the case.

Dated: November 10, 2022

THE PLAINTIFFS, BY THEIR ATTORNEYS,

*/s/ Sean K. Collins*

_____

Sean K. Collins
B.B.O. # 687158
Law Offices of
Sean K. Collins
184 High Street, Suite 503
Boston, MA 02110
Telephone: 855-693-9256
Fax: 617-227-2843
sean@neinsurancelaw.com

Jonathan M. Feigenbaum
B.B.O. #546686
Law Offices of
Jonathan M. Feigenbaum
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617-357-9700
Fax: 617-227-2843
jonathan@erisaattorneys.com

Brian S. King (PHV)
Brian S. King,
Attorney at Law
336 South 300 East,
Suite 200
Salt Lake City, UT 84111
Telephone: 801-532-1739
Fax:   801-532-1936
brian@briansking.com

Ex Kano S. Sams II (PHV)
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Fax: 310-201-9160
esams@glancylaw.com

Mala M. Rafik
B.B.O. # 638075
Rosenfeld & Rafik, P.C.
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617-723-7470
Fax: 617-227-2843
mmr@rosenfeld.com

*Attorneys for Plaintiffs and the
Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below my signature, a copy of the foregoing was electronically filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system. Parties not registered with the Court's electronic filing system will be served this same day by First Class U.S. Mail.

*/s/*Sean K. Collins
Dated: November 10, 2022